720 A.2d 342 (1998)
316 N.J. Super. 218
Leora MABEE, Plaintiff-Respondent,
v.
BORDEN, INC., Defendant-Appellant, and
Figgie International, Inc., Figgie Packaging Systems, Inc., George J. Meyer Manufacturing Co. Inc., Meyer World Packaging Machinery, Inc. and Alpha Packing Equipment, Inc., Defendants-Respondents, and
Def Co., Inc., R. Palmieri Electrical Contractors, Inc. of Landisville, NJ, Sawyer Electrical Co. of Wildwood, NJ; Bernal Mechanical Contractors, Inc. of Vineland, NJ, Carlson Associates, Inc. of Massachusetts, Carlson Management, Inc. of Massachusetts, Carlson Processing, Inc. of Massachusetts, Carlson Mid-Atlantic, Inc. of Pennsylvania, Carlson Holdings Corporation, and SAE America Mid-Atlantic, Inc. of Horsham, Pennsylvania, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued May 11, 1998.
Decided June 2, 1998.
*343 George J. Kenny, Roseland, argued the cause for appellant (Connell, Foley & Geiser and Freeman, Barton & Huber, attorneys; Mr. Kenny, of counsel; Thomas A. Sparno, on the brief).
Paul R. D'Amato, argued the cause for respondent Leora Mabee (Paul R. D'Amato, Linwood and Goldenberg, Mackler & Sayegh, attorneys, Atlantic City; Donna Lee Vitale, Mr. D'Amato, Kenneth Mackler, Atlantic City and Martin G. Picillo, West Orange, on the joint brief).
Martin G. Picillo, argued the cause for respondents Figgie International, Inc., Figgie Packaging Systems, Inc., George J. Meyer Manufacturing Co., Inc., Meyer World Packaging Machinery, Inc. and Alpha Packing Equipment, Inc. (Picillo, Caruso, attorneys, West Orange; Donna Lee Vitale, Paul R. D'Amato, Linwood, Kenneth Mackler, Atlantic City and Martin G. Picillo, on the joint brief).
Carpenter, Bennett & Morrissey, Newark, attorneys for Amicus Curiae American Insurance Association (John P. Dwyer, Craig A. Berrington, Bruce C. Wood, Washington, DC, and Steven A. Bennett, of counsel; Suzanne Braun, Newark, on the brief).
*344 Before Judges HAVEY, LANDAU and COLLESTER.
The opinion of the court was delivered by HAVEY, P.J.A.D.
While employed by defendant Borden, Inc., plaintiff sustained a work-related injury to her hand when she attempted to clean a labeling machine, the Alfa Labeler. She instituted suit against Borden and defendants Figgie International, Inc., Figgie Packaging Systems, Inc., George J. Meyer Manufacturing Co., Inc., Meyer World Packaging Machinery, Inc. and Alpha Packing Equipment, Inc. (collectively referred to as Figgie), companies involved in the manufacturing and marketing of the Alfa Labeler.
By leave granted, Borden appeals from the denial of its motion to dismiss plaintiff's complaint. It also appeals from summary judgment in plaintiff's favor determining that the "intentional wrong" exception to the exclusivity provision of the Workers' Compensation Act, N.J.S.A. 34:15-8, applied, thereby permitting plaintiff to sue Borden for her personal injuries. We affirm the denial of Borden's summary judgment motion, and reverse the summary judgment entered in plaintiff's favor.
The following facts are undisputed. In 1989, Borden, then located in Pine Point, Maine, purchased the Alfa Labeler to label its eight-ounce claim juice bottles. At that time Figgie offered Borden optional Plexiglas safety doors designed to prevent contact with moving parts of the machine. Borden declined the offer.
On June 29, 1990, a Borden employee, Michael Paskewicz, sustained severe injuries when his hand became entangled in the Alfa Labeler when he was cleaning excess glue from the bands of the machine while it was in operation. At the time, there was no safety device attached to the machine preventing access to the inner components of the machine.
Borden subsequently relocated to Cape May, New Jersey, moving all its labeling machinery, including the Alfa Labeler, to its new plant. There, a Borden engineer installed a "V" shaped guard, a metal plate placed in front of the "nip" point between the labeler's wheels to protect against hand injuries similar to the injury suffered by Paskewicz. On November 12, 1990, Figgie installed, at Borden's request, a Plexiglas safety enclosure with doors around the Alfa Labeler to protect employees against injury. At some point, the "V" shaped guard was unbolted and removed from the machine.
The purpose of the Plexiglas doors was to prevent access to the machine while the machine was operating. When the doors were opened, the machine automatically shut down. However, the Plexiglas doors interfered with routine maintenance. The Plexiglas enclosure required Borden mechanics to reach over the top of the enclosure by use of a ladder. A bypass switch was therefore installed, approximately one month after the Plexiglas enclosure was added to the machine. The bypass switch allowed mechanics to insert a key and turn the switch to "maintenance mode," providing access to the moving parts of the labeler.
Although the bypass switch was intended to provide maintenance personnel access to the machine, the evidentiary material presented suggests that the switch was also for the purpose of allowing operators easy access to the machine while in operation. This was necessary because the operators had continuous problems with excess glue accumulating between the machine's moving parts. The glue had to be cleaned from the machine approximately four to six times during a single eight-hour shift.
Borden representatives had complained that when the machine was shut off each time cleaning was required, the entire conveyor system was shut down for fifteen to twenty minutes. Therefore, according to Borden's Production Superintendent, Daniel Wynn, the key was therefore left in the machine and placed in the "bypass" or "maintenance" mode ninety-five to ninety-eight percent of the time, allowing the operators to open the Plexiglas doors while the machine remained in operation.
Plaintiff presented evidence that Borden had expended considerably more capital than anticipated at the Cape May Plant, was understaffed *345 and suffered substantial personnel turnover. Thus, prior to plaintiff's accident, there was workplace pressure; management endorsed a "hurry, hurry, hurry" policy to improve production.
There were no warnings on the Alfa labeler concerning the dangers inherent in cleaning the machine while in operation. It is also undisputed that Borden's supervisors knew of the hazards relating to an operator's hand being exposed to the moving parts of the machine.
Plaintiff worked for Borden as a machine operator. Prior to being transferred to the labeling department, other Borden employees trained plaintiff on the proper operation of the labeling machines, including the Alfa Labeler. Individual employee training generally included review of the safety orientation sheet, discussions with the safety coordinator, and orientation by the supervisor. Other than observing fellow employees, Borden did not require plaintiff to participate in the general safety training program.
Plaintiff did not regularly operate the Alfa Labeler while working in the labeling department. However, six weeks prior to her accident, Vicky Melencoff, the trained Alfa Labeler operator, instructed plaintiff for approximately an hour and half on how to insert labels into the machine, and remove excess glue from the machine's wheels and bands. When demonstrating the process, Melencoff showed plaintiff how to open the Plexiglas doors to adjust the labels, and clean the wheels with a rag. The machine continued to run when Melencoff opened the doors.
Approximately four weeks later, plaintiff was requested to operate the Alfa Labeler. On that occasion, Calvin Ireland, another regular Alfa Labeler operator, showed plaintiff the basic operation for an hour before her shift. Ireland explained that an operator was required to load the labels, inform maintenance of jams, and clean the machine of excess glue. In order to clean the machine, Ireland demonstrated that the operator takes a rag and wipes the excess glue off the bands and wheels of the machine. He further explained that the machine stops running when the Plexiglas doors are opened to clean the
machine. An employee typically cleaned the Alfa Labeler approximately four to five times during an eight hour shift.
During plaintiff's shift, the Alfa Labeler shut down each time she opened the Plexiglas doors to clean the machine. She experienced problems with excess glue causing the labels to incorrectly adhere to the bottles. The Alfa Labeler had a known problem with its glue dispensing system. The problem was attributed to the air pressure in the plant. Borden had replaced the glue dispensing pump once, but problems persisted. It was during this shift plaintiff discovered that there was a bypass switch.
On October 1, 1991, plaintiff was again requested to operate the Alfa Labeler. Prior to her break, plaintiff opened the Plexiglas doors twice to remove excess glue. The machine continued to run. After returning from her break at approximately 7:00 p.m., plaintiff again opened the doors to remove excess glue. However, this time her hand became entangled in the wheels of the Alfa Labeler.
Several minutes before plaintiff's accident, Robert Radigan, Borden's maintenance supervisor, observed plaintiff leaning over the Alfa Labeler "inside the doors" while the machine was in operation. Radigan said nothing to plaintiff about reaching into the machine while it was operating.
Plaintiff's liability expert, George P. Widis, a professional engineer, stated in his written report:
The hazardous, unsafe and dangerous condition of the subject [Alfa] labeling machine was known to Borden's sufficiently in advance of the injury event to Leora Mabee for the safety enclosure to be furnished and installed. However, Borden's then installed the keyed bypass switch that deactivated the safety function of the safety enclosure.
The keyed bypass switch created and promoted a foreseeable, hazardous, unsafe and dangerous condition of unguarded machine operation.
The keyed bypass switch installed by Borden's, created the virtual certainty of the injury event to Leora Mabee, that was *346 exactly the same as the prior Paskewicz event at Borden's.
As a result of her hand injury, plaintiff received workers' compensation benefits from Borden, totalling $192,683.34.
Plaintiff filed the present action against Borden, alleging, among other things, that Borden "substantially altered and modified the safety devices and mechanisms ... for the purpose of increasing the production ... and thus manifesting a deliberate intention to expose the Plaintiff to serious injury." She also asserts a strict liability claim against Figgie for a defect in the Alfa Labeler by virtue of its failure to warn of the dangerous propensities of the machine.
Borden moved for summary judgment, arguing that plaintiff's exclusive remedy was recovery under the Workers' Compensation Act, pursuant to N.J.S.A. 34:15-8. Plaintiff cross-moved, seeking a determination that Borden had committed an intentional wrong by deliberately altering the interlock mechanism of the Alfa Labeler, and thus she was not foreclosed from filing a complaint in law. The motion judge denied defendant's summary judgment motion and granted plaintiff summary judgment on liability, concluding that Borden's conduct constituted an "intentional wrong" as a matter of law. The judge focused on the facts relating to Borden's removal of the "V" shaped guard and installation of the bypass system on the Plexiglas cover. Despite its knowledge of the prior injury suffered by employee Paskewicz, the judge suggested that Borden's profit motive and production concerns induced it to alter the Alfa Labeler despite the predictable catastrophic consequences of its actions. He reasoned:
[T]he developing law recognizes the unfairness of depriving an employee of his common law remedies where the conduct of his employer rises to that degree of egregiousness that would cause a reasonable person to conclude that it is "practically certain," "substantially certain," or "virtually certain"... that some employee would be injured thereby. I am also satisfied that plaintiff need only establish that "some" employee would be injured and not that a deliberate intent be made by the employer to harm the particular plaintiff herself.
Considering the competing evidential materials presented on Borden's motion for summary judgment in a light most favorable to plaintiff, we are satisfied that there exists a "genuine issue" of material fact that precludes summary judgment in Borden's favor. Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 540, 666 A.2d 146 (1995).
The Workers' Compensation Act, N.J.S.A. 34:15-8, provides:
Such agreement shall be a surrender by the parties thereto of their rights to any other method, form or amount of compensation or determination thereof than as provided in this article and an acceptance of all the provisions of this article, and shall bind the employee and for compensation for the employee's death shall bind the employee's personal representatives, surviving spouse and next of kin, as well as the employer, and those conducting the employer's business during bankruptcy or insolvency.
If an injury or death is compensable under this article, a person shall not be liable to anyone at common law or other wise on account of such injury or death for any act or omission occurring while such person was in the same employ as the person injured or killed, except for intentional wrong.

[Emphasis added.]
Because the Act involved a historic "trade off" whereby employees relinquished their right to pursue common-law remedies in exchange for automatic entitlement to benefits for work-related injuries, the "intentional wrong" exception under N.J.S.A. 34:15-8 must be interpreted very narrowly in order to further these underlying quid pro quo goals, so that as many work-related disability claims as possible be processed exclusively within the workers' compensation system. Millison v. E.I. du Pont de Nemours & Co., 101 N.J. 161, 177, 501 A.2d 505 (1985).
In order to satisfy the statutory definition of "intentional wrong," the employee is required to show "deliberate intention" to injure. Bryan v. Jeffers, 103 N.J.Super. 522, *347 524, 248 A.2d 129 (App.Div.1968) (the Legislature intended the words "intentional wrong" to have their commonly understood signification of deliberate intention), certif. denied, 53 N.J. 581, 252 A.2d 157 (1969); see Arcell v. Ashland Chemical Co., Inc., 152 N.J.Super. 471, 496, 378 A.2d 53 (Law Div. 1977).
In Millison, supra, the Court stressed two factors that further defined "intentional wrong," namely conduct and context. 101 N.J. at 178-79, 501 A.2d 505; see also McGovern v. Resorts Int'l Hotel Inc., 306 N.J.Super. 174, 179, 703 A.2d 364 (App.Div. 1997). Focusing on "conduct," the Court determined that the quid pro quo of workers' compensation can best be preserved by applying the "intent" analysis of Prosser to determine what is an "intentional wrong" within the meaning of N.J.S.A. 34:15-8. Id. at 177, 703 A.2d 364. According to Prosser, the "common usage of intent ... extends not only to having in the mind a purpose (or desire) to bring about given consequences but also to having in mind a belief (or knowledge) that given consequences are substantially certain to result from the act." Prosser and Keeton on Torts § 8 at 34 (5th ed.1984).
Millison did not repudiate the earlier decisions of Bryan, supra, and Arcell, supra, but rather was a "logical development" of workers' compensation law. Millison, supra, 101 N.J. at 178, 501 A.2d 505. Thus, there is "only one level of intent sufficient to overcome the exclusivity of the Workers' Compensation Act, and `[b]oth subjective intent and substantial certainty of harm are expressive of the same standard, i.e. deliberate intent to harm.'" McGovern, supra, 306 N.J.Super. at 179, 703 A.2d 364 (quoting New Jersey Mfrs. Ins. Co. v. Joseph Oat Corp., 287 N.J.Super. 190, 197, 670 A.2d 1071 (App.Div.1995)). The employee may prove "intent to injure" not only by evidence of the employer's actual intent to injure, but also by circumstances where the employer knows an injury is a substantial or virtual certainty. New Jersey Mfrs. Ins. Co., 287 N.J.Super. at 197, 670 A.2d 1071; see also Restatement (Second) of Torts § 8A at 15 (1965).
Furthermore, the Millison Court recognized "context" as a second significant component of "intentional wrong." Millison, supra, 101 N.J. at 178-79, 501 A.2d 505.
Courts must examine not only the conduct of the employer, but also the context in which that conduct takes place: may the resulting injury or disease, and the circumstances in which it is inflicted on the worker, fairly be viewed as a fact of life of industrial employment, or is it rather plainly beyond anything the legislature could have contemplated as entitling the employee to recover only under the Compensation Act?

[Id. at 179, 501 A.2d 505.]
In Millison, supra, plaintiffs employees filed a civil action against their employer claiming, first, that defendant employer and its doctors intentionally injured the plaintiffs by deliberately exposing them to asbestos, and second, aggravated these injuries by fraudulently concealing specific medical information obtained during employee physical examinations that revealed diseases already contracted. Id. at 165-66, 501 A.2d 505. Under its two factor analysis of "deliberate intent to injure," the Court acknowledged that the employer's conduct in knowingly exposing the plaintiffs to asbestos clearly amounted to deliberately taking risks with the employee's health. Id. at 179, 501 A.2d 505. However, "the mere knowledge and appreciation of a riskeven a strong probability of a riskwill come up short of the `substantial certainty' needed to find an intentional wrong...." Ibid. The Court therefore found that the plaintiffs' injuries resulting from the initial exposure was precluded by the exclusivity of the Compensation Act. Ibid.[1]
Nevertheless, the Court determined that the plaintiffs had pleaded a valid cause of action for aggravation of their initial exposure. Id. at 181, 501 A.2d 505. Plaintiffs contended that although the employer's doctors discovered indications of asbestos-related *348 injuries from chest x-rays, the doctors failed to inform the employees of such findings, and instead sent them back to work under the same hazardous conditions. Id. at 182, 501 A.2d 505. The Court found "a difference between, on the one hand, tolerating in the workplace conditions that will result in a certain number of injuries or illnesses, and, on the other, actively misleading the employees who have already fallen victim to those risks of the workplace." Ibid. Such intentionally-deceitful action goes beyond that which the Legislature, in passing the Compensation Act, could have intended to insulate from tort liability. Ibid.
Since the Millison decision defining "intentional wrong," New Jersey courts have yet to find an employee's allegations of intentional conduct sufficiently flagrant so as to trigger the exception to the exclusivity bar. See McGovern, supra, 306 N.J.Super. at 180-81, 703 A.2d 364 (plaintiff, a security guard injured during a robbery, failed to prove employer casino had a "deliberate intent to injure," where she alleged that the employer transported money in the presence of the public despite employee complaints); Marinelli v. Mitts & Merrill, 303 N.J.Super. 61, 71-73, 696 A.2d 55 (App.Div.1997) (employees' allegations that their employer failed to provide them with material safety data sheets indicating the explosive nature of hairspray aerosol cans, but required employees to dispose of the cans by crushing or shredding them, are insufficient to establish the statutory intentional wrong exception; the injury was caused by gross negligence or an abysmal lack of concern for the safety of employees); Bustamante v. Tuliano, 248 N.J.Super. 492, 500-01, 591 A.2d 694 (App. Div.) (a police officer's case should not have gone to the jury where a co-worker who shot the officer in the eye during a training session with the intent to "sting" him, did not act with an intent to injure), certif. denied, 126 N.J. 385, 599 A.2d 162 (1991). See also Stephenson v. R.A. Jones & Co. Inc., 103 N.J. 194, 199-200, 510 A.2d 1161 (1986) (while ruling on a manufacturer's indemnification claim against an employer, the Court noted that assuming the manufacturer sent the safety guard with the machine to the employer's plant, and later urged installation of the guards, the employer's failure to install the guard "may bespeak negligence ... but that is the kind of conduct that is immunized by the Workers' Compensation Act").
However, in Calderon v. Machinenfabriek Bollegraaf Appingedam BV, 285 N.J.Super. 623, 667 A.2d 1111 (App.Div.1995), certif. denied, 144 N.J. 174, 675 A.2d 1122 (1996), we observed in dictum that a plaintiff-employee may demonstrate a prima facie case of "intentional wrong" upon proof of the employer's alteration of a workplace machine by removal of a safety device. Id. at 637, 667 A.2d 1111. In Calderon, an employee's arm was amputated as he reached into a baling machine to untangle some wire while it was still running. Id. at 625, 667 A.2d 1111. The employer had deliberately removed the attached safety device which would have automatically shut down the machine when employees reached into the machine. Id. at 627, 667 A.2d 1111. The suit was against the manufacturer and distributor of the machine, and not against the employer. Id. at 628, 667 A.2d 1111. Thus, the court was not called upon to decide whether the employer's conduct constituted an "intentional wrong." Nevertheless, we observed that a jury might, if presented with the issue, decide on the facts that the employer knew with substantial certainty that an employee would be severely injured. Id. at 637, 667 A.2d 1111. We added:
Severe inequities are visited upon workers by the actions of their employers in removing, disconnecting, refusing to install, or otherwise thwarting safety devices that are provided to protect the users of industrial machinery. Such employees are generally left to the inadequate remedies of workers' compensation, virtually sacrificed on the altar of production quotas with no downside risk to the employer.

[Id. at 636, 667 A.2d 1111.]
See also Seeley v. Cincinnati Shaper Co., Ltd., 256 N.J.Super. 1, 10-11 n. 4, 606 A.2d 378 (App.Div.1992).
Preliminarily, we reject plaintiff's argument, fortified by our dicta in Calderon and Seeley, that alteration or removal of a safety device presents a per se prima facie *349 case of "intentional wrong." We are bound by Millison. Thus, each set of facts respecting product alteration in the workplace must be examined on a case-by-case basis to determine whether a jury question exists respecting the "intentional wrong" issue. That examination must be tempered by Millison`s strong caution that the "intentional wrong" exception must be interpreted narrowly in order to further the underlying quid pro quo goals of the Workers' Compensation Act. Millison, supra, 101 N.J. at 177, 501 A.2d 505. Absent an express legislative amendment to the Act addressing the product alteration issue, we reject the per se approach and apply the Millison analysis.
Borden knew of the substantial danger which inhered in the labeling machine without proper protective devices. It was aware that fifteen months before plaintiff's injury, another Borden employee had injured his hand in the unguarded Alfa Labeler while undertaking essentially the same cleaning procedure undertaken by plaintiff. Thereafter Borden installed a "V" shaped guard over the nip point of the machine to protect the operators. However, the "V" shaped guard was removed. Because the guard had been installed on a machine under the exclusive control of Borden, it is not a leap of logic to conclude that a Borden employee, at the direction of Borden's supervisors, removed the "V" shaped guard for whatever reason. It certainly cannot be disputed that Borden's supervisors knew that the "V" shaped guard had been removed.
Eleven months before plaintiff's injury, Borden installed the Plexiglas cover. A bypass switch was installed to permit access to the machine for maintenance purposes. On the disputed facts, a jury could nevertheless conclude that a general policy was adopted by Borden allowing operators as well unimpeded access to the machine while in operation to remove excess glue without interrupting production. The switch was therefore left in "maintenance mode" at least ninety-five percent of the time to avoid shut down of the machine, and Borden personnel encouraged the operators to utilize the switch to minimize holdups in production. Thus, a factfinder could reasonably conclude that the Plexiglas guard was essentially rendered ineffectual.
Moreover, although other Borden labeling machines contained "hazard" signs, the Alfa Labeler displayed no warning signs. Finally, plaintiff's expert, based on the depositions and statements of Borden personnel, opined that alteration of the safety mechanisms resulted in a "virtual certainty" that employee injuries would occur. In short, the evidential material permitted a reasonable inference that Borden knew an occurrence of injury to an operator of the machine was substantially certain when it deliberately removed one safety guard and essentially nullified the effectiveness of the second.
Millison is distinguishable. The Court held that an employer's knowing exposure of its employee to asbestos, involving "the mere knowledge and appreciation of a risk [of occupational disease]even a strong probability of a riskwill come up short of the `substantial certainty' needed to find an intentional wrong...." Millison, supra, 101 N.J. at 179, 501 A.2d 505. As noted, here, plaintiff's expert relied on substantial evidential material respecting the history of the Alfa Labeler, removal of the "V" shaped guard and installation of the bypass device on the Plexiglas cover, Borden's awareness of the dangers inherent in the machine while in operation without protective devices, and concluded that there was a "virtual certainty" that operators would sustain injuries in operating the unguarded machine.
Moreover, the Court in Millison emphasized that the "express inclusion of occupational diseases as part of the Compensation Act reflects a general awareness of potentially-hazardous conditions in the workplace that may result in debilitating diseases necessitating occupation." Id. at 175-76, 501 A.2d 505. Thus, it concluded:
In the face of the legislature's awareness of occupational diseases as a fact of industrial employment, we are constrained to conclude that plaintiffs-employees' initial resulting occupational disease must be considered the type of hazard of employment that the legislature anticipated would be compensable under the terms of the Compensation *350 Act and not actionable in an additional civil suit.

[Id. at 179, 501 A.2d 505.]
Here, the Legislature may have been aware of the fact that assembly-line employees may be exposed to work-related injuries arising from unguarded machinery. However, it cannot seriously be argued that the Legislature expected that employers would deliberately alter components of its system or remove safety devices because of profit motive or production concerns. Nothing in the statutory scheme suggests that the Legislature "anticipated" that this type of deliberate conduct "would be compensable under the terms of the Compensation Act and not actionable in an additional civil suit." Ibid. We therefore conclude that Borden's summary judgment motion was properly denied.
We reverse the grant of summary judgment in favor of plaintiff. We cannot say that the evidential material justified a liability determination that Borden committed an "intentional wrong" as a matter of law. It may be that the jury will determine that Borden's actions constituted negligence, or even gross negligence, conduct which falls short of the demanding "intentional wrong" standard as defined by Millison. For example, Borden focuses on deposition testimony that the bypass device was installed solely for the purpose of allowing maintenance workers access to the machines, and it was not a Borden policy to permit operators access to the machine while in operation. Borden also points to the fact that its employee, Calvin Ireland, taught plaintiff the basic operation of the Alfa Labeler and explained to her that he stops the machine before attempting to wipe the excess glue off the machine's bands and wheels. In our view, the "intentional wrong" issue is for jury resolution.
The order denying defendant's summary judgment motion is affirmed. The order granting plaintiff summary judgment as to liability is reversed. The matter is reversed and remanded for further proceedings consistent with this opinion.
NOTES
[1] After remand in Millison, we affirmed a jury verdict in favor of plaintiffs. See 226 N.J.Super. 572, 545 A.2d 213 (App.Div. 1988), aff'd, 115 N.J. 252, 558 A.2d 461 (1989).