762 A.2d 311 (2000)
335 N.J. Super. 330
Rudolph LAIDLOW and Jean Laidlow, Plaintiffs-Appellants,
v.
HARITON MACHINERY CO., INC., and Advanced Metallurgy AMI-DDC, Inc., Defendants-Respondents/Cross-Appellants, and
Richard Portman, Defendant-Respondent,
Jay Hill Industries, Inc., United Engineering and Foundry Co. Inc. Air Wire/Doduco, Urse Inc., Wean Inc., Barto Inc., Division of Technitrol, United Engineering, Inc., Foundry Inc., Danieli United, a Division of United Foundry, Inc., Joseph Yasenka, individually and t/a Jay Hill Industries, an unincorporated entity, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued September 20, 2000.
Decided December 6, 2000.
*313 Amy L. Fenno, argued the cause for appellants, (Fost, Muscio & Caruso, attorneys; Ms. Fenno, of counsel and on the brief).
Richard P. Maggi, argued the cause for respondent/cross-appellant, Hariton Machinery Co., Inc., (McDermott & McGee, Millburn, attorneys; Mr. Maggi, on the brief).
Francis X. Manning and Kenneth E. Pogash, Roseland, argued the cause for respondent/cross-appellant, AMI DDC, Inc., (Stradley, Ronon, Stevens & Young, Cherry Hill and Guida Fabricant & Bressler, attorneys; Mr. Manning and Mr. Pogash, on the briefs).
Francis X. Manning, Cherry Hill, also argued the cause for respondent, Richard Portman, (Stradley, Ronon, Stevens & Young, attorneys; Mr. Manning, on the brief).
Before Judges BAIME, CARCHMAN and LINTNER.
*312 The opinion of the court was delivered by CARCHMAN, J.A.D.
Plaintiff Rudolph Laidlow suffered a serious and debilitating injury when his fingers and hand were caught in a rolling mill which plaintiff was operating in the course of his employment. After prosecuting a workers' compensation claim against his employer, defendant AMI-DDC, Inc. (AMI), plaintiff filed a personal injury claim against AMI, asserting that the "intentional wrong" exception to the Workers' Compensation Act, N.J.S.A. 34:15-8, applied, and plaintiff was not barred from *314 seeking further recovery against AMI. Plaintiff sought additional relief against defendant Hariton Machinery Corp., the "seller" of the rolling mill, asserting strict liability under the Products Liability Act, N.J.S.A. 2A:58C-1 to -11. Finally, plaintiff sought relief against a fellow employee, Richard Portman, substantively for liability and damages, as well as for discovery purposes.
On a series of motions for summary judgment, the various motion judges dismissed plaintiff's complaint and concluded that plaintiff had failed to establish a genuine issue of material fact regarding the standard of "intentional wrong," that Hariton was not a "seller" under N.J.S.A. 2A:58C-2, and that Portman was not a proper party-defendant. Hariton's motion for summary judgment seeking indemnification from AMI was also granted.
Plaintiff appealed, and Hariton cross-appealed. We conclude that the determinations of the motion judges were correct, and that they did not err in dismissing plaintiff's complaint as to AMI, Hariton, and Portman. Accordingly, we affirm and dismiss the cross-appeal as moot.
These are the relevant facts as viewed most favorably to plaintiff. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). On December 11, 1992, plaintiff, an employee of AMI, was performing his job as a "set up man," which required him to work with a rolling mill which changed the dimension of heated metal bars when they were inserted into the mill. Plaintiff manually inserted the bars into a "channel" which guided them into the mill, and often had to apply pressure to the bars to feed them into the rollers. On the day of the accident, plaintiff's glove became caught as he was pushing a bar of silver into the channel toward the rollers. Plaintiff's gloved hand was pulled up to the mill. An eyewitness, plaintiff's co-worker Steven Smozanek, described the incident as follows: "The rollers are approximately 18 inches in diameter, and as he was feeding the bar into the roller, it pulled his hand against the roller, not into the roller, and as it pulled the hand against the roller, it just ripped the glove and the skin right off his hand."
On a prior occasion, plaintiff's glove was hooked on a bar, but he was able to slip his hand out of the glove before it was pulled into the machine. Smozanek described a similar incident when he was working on the mill and his gloved hand had snagged on a bar, but he too, was able to pull his hand out of the glove before it was pulled into the mill.
The mill which performed this task was purchased by AMI in 1978 for $36,000 from Hariton, a company that buys and sells new and used metal-working machinery. The used mill was located by Hariton at AMI's request. After inspecting the mill at a third party's location, AMI purchased the mill from Hariton. Hariton never took possession or control of the mill, but did take title. The mill was transported directly from its prior location to AMI.
At the time of the purchase, the mill did not have a safety guard. Several months after the purchase, a guard was installed. It was "never" in the proper position, and from 1979 to the date of his accident in 1992, the guard was always "tied up." According to plaintiff, the guard was placed in the proper position only when OSHA[1] inspectors came to the plant. On these occasions, Portman, plaintiff's supervisor, would instruct employees to remove the wire that held the safety guard up. As soon as the OSHA inspectors left, the safety guard would again be tied up. Plaintiff operated the mill without the safety guard in place for approximately twelve to thirteen years. During that period, except for the "near misses" referred to earlier, there were apparently no accidents with this mill until plaintiff was injured.
*315 Plaintiff spoke with Portman regarding the safety guard three times before this incident. Approximately two weeks prior to this accident, plaintiff asked him to put the guard in place. Several weeks prior to that, he spoke to Portman because a new operator was going to work on the mill, and plaintiff thought the guard should be put in place. Additionally, one week before the incident, plaintiff expressed concern that a new, inexperienced operator was going to begin work on the mill, and he told Portman that it was dangerous not to use the guard. According to plaintiff, Portman responded to these requests by stating that "it was okay" and "not a problem," and "walk[ing] away." Plaintiff, however, never refused to operate the mill without the safety guard in place, and never spoke with any other superior in the company regarding the safety guard.
The guard was not used because its presence, although protective of employees, slowed down the mill operation. Gerald Barnes, a professional engineer retained by plaintiff, opined that AMI "knew that the absence of the panelbar gate posed a substantial risk to workers including [plaintiff] since the supervisors directed them to put the guard back into position prior to each OSHA inspection."
Judge Wilson granted summary judgment in favor of AMI, concluding that the Workers' Compensation Law provided the exclusive remedy to plaintiff because he failed to demonstrate intentional injury. In so finding, she stated:
I have a machine here that was operating in this State for 12 years with no injuries. And what I have on the other side is somebody's statementcertainly not the plaintiff's own statement, but somebody's statement that there was a substantial certainty here. But that's a conclusion of law. It's not an allegation of fact. It's not evidence. So it's not something that I could send to the jury to supportor to allow them to consider whether or not there was intent to injure. Consistent with Judge Wilson's ruling, Judge Cramp thereafter granted summary judgment to Portman as a co-employee, finding that because of the dismissal as to AMI, Portman was not liable for an intentional tort. Judge Cramp also determined that Portman could not be maintained as a defendant solely for the purposes of obtaining discovery.
Judge Cramp additionally concluded that Hariton was entitled to summary judgment because it was not a seller under the Products Liability Act, but rather, was merely a broker. Finally, Judge Cramp granted summary judgment to Hariton against AMI, concluding that AMI was required to indemnify Hariton for any damages it suffered because of an indemnification clause included in the invoice of purchase. This appeal and cross-appeal followed.
On appeal, plaintiff asserts that a genuine issue of material fact exists as to whether this was an "intentional wrong," that the motion judge erred in dismissing the complaint as to Portman, and that Hariton was a seller under the Products Liability Act. As to the claim of an intentional tort, AMI counters that the claim is barred by the two year statute of limitations, N.J.S.A. 2A:14-2.
Plaintiff claims that despite his recovery of workers' compensation benefits, he was entitled to further damages because AMI's conduct fell within the exception to the exclusive remedy provision of N.J.S.A. 34:15-8. That statute provides in pertinent part:
If an injury or death is compensable under this article, a person shall not be liable to anyone at common law or otherwise on account of such injury or death for any act or omission occurring while such person was in the same employ as the person injured or killed, except for intentional wrong.

[N.J.S.A. 34:15-8.]
The limitation contained in the statute reflects the policy and objectives of the *316 workers' compensation system, constituting a "historic trade-off whereby employees relinquished their right to pursue common-law remedies in exchange for automatic entitlement to certain, but reduced benefits whenever they suffered injuries by accident arising out of and in the course of employment." Millison v. E.I. du Pont de Nemours & Co., 101 N.J. 161, 174, 501 A.2d 505 (1985). The statute does, by its terms, permit the pursuit of additional remedies if the injury to the employee resulted from the employer's "intentional wrong."
That broad termintentional wrong was defined by the Supreme Court in Millison, which noted that because of the policy goals behind the Act, the "intentional wrong" exception is to be interpreted narrowly. Id. at 177, 501 A.2d 505. The Court concluded that the intent necessary to meet this high bar required a demonstration that the employer knew with "substantial certainty" that the employee would be harmed by the employer's act or omission. Id. at 178, 501 A.2d 505. Additionally, the Court concluded that a trial judge must also examine the context of the employer's conduct and ask the following question: "may the resulting injury or disease, and the circumstances in which it is inflicted on the worker, fairly be viewed as a fact of life of industrial employment, or is it rather plainly beyond anything the legislature could have contemplated as entitling the employee to recover only under the Compensation Act?" Id. at 179, 501 A.2d 505.
In defining intent, the Court adopted the view that "the `common usage of intent ... extends not only to having in the mind a purpose (or desire) to bring about given consequences but also to having in mind a belief (or knowledge) that given consequences are substantially certain to result from the act.'" Mabee v. Borden, Inc., 316 N.J.Super. 218, 227, 720 A.2d 342 (App.Div.1998) (quoting Prosser and Keeton on Torts § 8 at 34 (5th ed.1984)). Thus, "[t]he employee may prove `intent to injure' not only by evidence of the employer's actual intent to injure, but also by circumstances where the employer knows an injury is a substantial or virtual certainty." Id. at 227-28, 720 A.2d 342. See also Bryan v. Jeffers, 103 N.J.Super. 522, 524, 248 A.2d 129 (App.Div.1968), certif. denied, 53 N.J. 581, 252 A.2d 157 (1969) (impugning the concept of deliberate intention to the words "intentional wrong").
Subsequent to the grant of summary judgment to AMI, we decided Mabee v. Borden, Inc., supra, and concluded that under the facts presented, an employee had demonstrated sufficient evidence of an "intentional wrong" to defeat defendant employer's motion for summary judgment. 316 N.J.Super. at 233, 720 A.2d 342. Plaintiff in Mabee was an employee who suffered severe hand injuries while using a labeling machine. Fifteen months prior to plaintiff's injury, another employee injured his hand in the labeling machine, which prompted the employer to install a "V" shaped guard over the machine's nip point to protect employees. The "V" shaped guard had, at some point, been removed. Although it was not clearly established who removed the guard, we found that "[b]ecause the guard had been installed on a machine under the exclusive control of Borden, it is not a leap of logic to conclude that a Borden employee, at the direction of Borden's supervisors, removed the `V' shaped guard for whatever reason." Id. at 231, 720 A.2d 342. Therefore, regardless of who actually removed the guard, we concluded that Borden's supervisors clearly knew that it had been removed.
A second safety mechanism was also at issue in Mabee. Eleven months prior to plaintiff's accident, Borden installed a Plexiglass cover. Borden also installed a bypass switch which was intended to permit access to the machine for maintenance purposes. Nevertheless, the switch was apparently in "maintenance mode" ninety-five percent of the time in order to allow employees greater access to the machine. *317 We noted that "Borden personnel encouraged the operators to utilize the switch to minimize holdups in production." Ibid. In sum, we concluded that "the evidential material permitted a reasonable inference that Borden knew an occurrence of injury to an operator of the machine was substantially certain when it deliberately removed one safety guard and essentially nullified the effectiveness of the second." Id. at 232, 720 A.2d 342. However, although we noted that the jury might find that Borden's actions were only negligent rather than intentional, plaintiff had demonstrated sufficient facts for the jury to find that her employer's conduct met the definition of "intentional wrong." Id. at 233, 720 A.2d 342.
As we observed in Mabee, our earlier decision, Calderon v. Machinenfabriek Bollegraaf Appingedam BV, 285 N.J.Super. 623, 667 A.2d 1111 (App.Div.1995), certif. denied, 144 N.J. 174, 675 A.2d 1122 (1996), suggested in dictum that an employer's removal of a safety device might be sufficient to demonstrate a prima facie case of "intentional wrong." Id. at 637, 667 A.2d 1111. We rejected that view in Mabee, supra, 316 N.J.Super. at 230-31, 720 A.2d 342, and do so here as well, noting Millison's mandate to interpret the "intentional wrong" exception narrowly to avoid invading the Legislature's prerogative to expand the exception to include the removal of safety devices.
Plaintiff suggests that Mabee represents a departure from Millison and requires reinstatement of plaintiff's complaint because the facts are analogous and reach the threshold showing of a "substantial certainty" that plaintiff would suffer an injury. Plaintiff argues that his supervisors' knowledge of the danger imposed by the failure to use the safety guard was evidenced by the practice of using the guard when OSHA inspectors were on the premises. Thus, plaintiff contends that his employer knew with "substantial certainty" that removal of the safety guard would cause harm to employees.
The applicability of both Millison and Mabee, however, requires further analysis of the employer's conduct in "context." Millison supra, 101 N.J. at 179, 501 A.2d 505; Mabee, supra, 316 N.J.Super. at 228, 720 A.2d 342. Here, plaintiff had used the mill for twelve years, and during that period the safety guard was not used as a matter of course. Although there is evidence of earlier "close calls" with the mill by both plaintiff and another employee, there were no previous injuries with the mill. The lack of any accident for a twelve-year period dispels the notion that plaintiff demonstrated the "substantial certainty" of injury necessary to demonstrate an intentional wrong.
In denying plaintiff's motion for reconsideration after our decision in Mabee, Judge Cramp concluded:
But looking at the facts in this case and putting it all in context, and understanding that Mabee didn't change the law, it's just Mabee happens to be the first case to come along and say that this person satisfied the requirements. I don't think it's right for a later judge to come along and say the previous judge was wrong when we're all, including the Mabee court, ... applying the same law, and that's the law that was set down in Millison. So I will deny the application.
We agree that Mabee did not change the law. During oral argument, some mention was made of the substantial risk facing employees when a safety guard or other protective device is removed. We agree that a substantial risk of injury may be suggested by such conduct, but the statute and Millison require more. It is not merely a substantial risk of injury, but a substantial or virtual certainty of injury which must be established. In Mabee, injuries to an employee resulted in the installation of a safety device which was thereafter disabled through the installation and use of a switch keyed to permit bypass of the safety device. Plaintiff was a periodic operator of the labeling machine. *318 During her prior operations, the safety device was operable. On the date of her accident, the device had been bypassed, resulting in her injury. We concluded that use of the bypass device under those circumstances created a jury question as to whether there was "substantial certainty" of injury.
The facts here are distinguishable. Plaintiff knew the safety guard was not in place, and he had operated the mill without accident for a period of twelve years. The anecdotal "close calls" may well demonstrate substantial risk, but they fail to establish the virtual or substantial certainty of injury required by the statute. The motion judge correctly dismissed the complaint as to AMI.
We make an additional observation. Our conclusion that plaintiff failed to meet the threshold of "substantial certainty" under the statute should not be construed as condoning AMI'S conduct in using the safety device only in anticipation of OSHA inspections and removing the device after those inspections. Such conduct is unquestionably reprehensible, and certainly suggests a knowing violation of OSHA regulations. However, it does not rise to the level of creating a "substantial certainty" that an injury would occur absent the safety guard. Cf. Alloway v. Bradlees, Inc., 157 N.J. 221, 236, 723 A.2d 960 (1999) ("[T]he violation of OSHA regulations without more does not constitute the basis for an independent or direct tort remedy."); Kane v. Hartz Mountain Indus., Inc., 278 N.J.Super. 129, 144, 650 A.2d 808 (App.Div.1994), aff'd o.b., 143 N.J. 141, 669 A.2d 816 (1996) ("[T]he finding of an OSHA violation ... does not constitute negligence per se.").
We do not urge, as our dissenting colleague suggests, that the twelve-year accident-free period is dispositive of the contextual prong of the Millison test. What is at issue here is a workplace condition and circumstance that reasonable persons could not conclude constitute a substantial or virtual certainty of injury. This view does not provide an opportunity for "one free injury," for it is not an injury that proves certainty, but the workplace conditions described, and whether they implicate substantial or virtual certainty.
Factories and industrial sites, by their very nature, are dangerous places. Employees who work in factories must be careful, "watch out" and use common sense. The test is not whether there is a chance or even substantial risk of injury, for we acknowledge that the "near misses" of caught gloves demonstrated that risk. The Legislature required more when an employee seeks to scale the high bar presented by N.J.S.A. 34:15-8. The statute requires certainty rather than mere risk.
We likewise disagree with our colleague's view that the OSHA violation "is conclusive evidence of the context component." Unfortunately, employers from time to time engage in unlawful conduct such as disabling required safety devices either as a violation of OSHA regulations or, as here, to affirmatively deceive OSHA. But while such conduct may rise to the level of exposing the employer to regulatory violations, it neither creates a virtual certainty of injury nor warrants such a per se finding. As we previously noted, this is substantively the same position that we recently rejected in Mabee, and we reject here as well.
We further agree with Judge Cramp that there is no basis for maintaining an action against Portman. Our determination that plaintiff cannot proceed against AMI precludes any substantive cause of action against Portman. Moreover, we agree with the judge that plaintiff failed to demonstrate any need to retain Portman as a party-defendant for discovery purposes. Unlike Davila v. Continental Can Co., 205 N.J.Super. 205, 500 A.2d 721 (App.Div.1985), where defendant-employer remained a defendant for discovery purposes because of its unique knowledge about the manufacture and distribution of *319 a machine in issue, plaintiff failed to establish that Portman possessed any such information. We are not persuaded that his presence as a defendant is mandated,[2] and we need not decide here whether plaintiff's notice to Portman of his concerns about the safety guard and Portman's responses may have been admissible under appropriate exceptions to the hearsay rule. See, e.g., N.J.R.E. 803(b)(4) (delineating the hearsay exception for statements by party-opponents via their agents or servants).
We next address the dismissal as to Hariton. The motion judge concluded that Hariton was not a seller. We previously noted that while Hariton took title to the mill before transferring it to AMI, it never took possession of the mill or maintained any control over the device.
In Oscar Mayer Corp. v. Mincing Trading Corp., 744 F.Supp. 79 (D.N.J.1990), Judge Wolin determined that a broker who sold a shipment of peppercorns containing small stones was not liable for damages even though the broker was engaged in the distribution of the defective product. Oscar Mayer had ordered peppercorns to be used in its salami from Mincing, who, in turn, asked a spice broker, Sayia, to locate the product. Sayia never took title to, or possession or control of the peppercorns. Oscar Mayer paid damages to consumers injured by the stones and sued Mincing. Mincing filed a third-party complaint against Sayia.
In determining that Sayia was not strictly liable in tort for the defective peppercorns, Judge Wolin noted that strict liability extends to all parties in the chain of distribution of defective product, including "manufacturers, distributors, suppliers or retailers and other parties that receive, sell, or resell the product." Id. at 84. As to brokers' liability, he concluded:
[a] broker who negotiates a contract of sale between the merchants who will be parties to the actual sale transaction does not fall within this category. Whereas an enterprise engaged in the chain of distribution can recapture the expense of an occasional defective product by an increase in the cost of the product, and a party that is in a contractual relationship with the manufacturer or supplier is in a position to exert pressure to ensure the safety of the product, a broker can do neither.

[Ibid. (citations omitted).]
The judge observed that under the circumstances, fairness dictated that no liability be imposed on the broker for defects it was unable to control or eliminate. Id. at 84-85.
Where a broker actually took title to an allegedly defective product, the district court reached a different result. In Straley v. United States, 887 F.Supp. 728 (D.N.J.1995), defendant broker took title to a garbage truck, but argued that it was not liable for injuries caused by the truck because it had never inspected or taken physical possession of the truck. The court rejected defendant's argument, stating that defendant could not "hide behind" the label of broker"the fact that [defendant] never took physical possession of the truck [could not] negate the fact of its ownership or its subsequent placement of the truck into the stream of commerce." Id. at 743-44.
In Lyons v. Premo Pharmaceutical Labs, Inc., 170 N.J.Super. 183, 406 A.2d 185 (App.Div.), certif. denied, 82 N.J. 267, 412 A.2d 774 (1979), we addressed the question of whether a "broker" of the drug DES could be strictly liable in tort for injuries sustained by the child of a woman who took the drug while she was pregnant. Id. at 188-89, 406 A.2d 185. While acknowledging *320 that the broker was "in a sense, in the chain of distribution and contributed to placing the product in the stream of commerce," we ultimately determined that the broker "must be shown ... [to have] exercised control over the product" in order to be held strictly liable for injuries caused by the product. Id. at 196-97, 406 A.2d 185. We concluded that the broker's role was that of a facilitator rather than an "active participant," noting that the broker never had physical control of the product and had merely arranged the sale. Id. at 196, 406 A.2d 185.
We disagree with plaintiff's suggestion that New Jersey case law supports the view that Hariton's broker status alone provides a sufficient basis for imposing strict liability. Although several New Jersey cases deal with used machinery dealers' liability for injuries caused by defective products, they are distinguishable from this case. See, e.g., Realmuto v. Straub Motors, Inc. 65 N.J. 336, 342, 344-45, 322 A.2d 440 (1974) (holding that evidence of a used car dealer's repairs prior to plaintiff's purchase of a defective vehicle was sufficient to withstand defendant's motion for judgment under "all conceivable bases of action against the dealer," and that "a used car dealer ought to be subject to strict liability in tort with respect to a mishap resulting from any defective work, repairs or replacements he has done or made in the vehicle before the sale"); Ortiz v. Farrell Co. 171 N.J.Super. 109, 112, 407 A.2d 1290 (Law Div.1979) (holding that summary judgment for broker of used plastic pelletizer was precluded despite the fact that it had never exercised control over the machine because the broker expressly agreed to "`assume any and all responsibility and liability'" arising from future use and handling of the machine); Turner v. Int'l Harvester Co., 133 N.J.Super. 277, 292, 294, 336 A.2d 62 (Law Div. 1975) (extending Realmuto, supra, in holding that summary judgment for the commercial seller of a defective used truck was inappropriate where the truck was sold "as is" to an ordinary consumer in the absence of any unequivocal waiver of safety defects by the plaintiff-purchaser and under circumstances indicating disproportionate bargaining power).
Subsequent to the accident in this case, the Legislature amended the Products Liability Act, N.J.S.A. 2A:58C-8 to -11. While the amendments only apply to causes of action arising after June 29, 1995, and thus are not applicable to this 1992 incident, the added definition of "product seller" is instructive:
"Product seller" means any person who, in the course of a business conducted for that purpose: sells; distributes; leases; installs; prepares or assembles a manufacturer's product according to the manufacturer's plan, intention, design, specifications or formulations; blends; packages; labels; markets; repairs; maintains or otherwise is involved in placing a product in the line of commerce.

[N.J.S.A. 2A:58C-8] The operative provision of the amendment would relieve Hariton of liability upon the filing of an affidavit identifying the manufacturer,[3]N.J.S.A. 2A:58C-9b, absent a showing that Hariton exercised significant control over the product, knew or should have known of the defect which caused the injury, or created the defect. N.J.S.A. 2A:58C-9d(1)-(3). None of these exceptions is present here.
We reject the bright-line rule espoused in Straley and conclude that the factual circumstances presented here do not warrant the imposition of strict liability on Hariton. Hariton's role was no more than that of the broker's described in Oscar Mayer. While it did take title to the mill, that was merely a business accommodation rather than a requisite affirmative act placing the mill in the line of *321 commerce so as to justify the imposition of strict liability. We do not suggest that under appropriate circumstances, taking title will not be a factor in determining whether a broker has entered the chain of distribution, but under the narrow facts presented on this appeal, we decline to adopt that single fact as dispositive of Hariton's liability. Its employees merely located a mill which was then inspected by AMI. Hariton never took possession of the mill, never altered its characteristics, and, without dispute, simply acted as a broker. We are satisfied that, without more, no liability attached to Hariton as a seller and the grant of summary judgment was appropriate.
Because we have determined that the motion judges correctly dismissed the complaint as to AMI, Hariton, and Portman, we need not address the statute of limitations issue or the indemnification issues raised on the cross-appeal.
We affirm the judgment of the Law Division dismissing plaintiff's complaint and dismiss the cross-appeal as moot.
LINTNER, J.A.D. (dissenting).
My colleagues have concluded that, with the exception of a couple of close calls, the fact that there was no accident over a period of twelve years is dispositive on the issue of substantial certainty. I respectfully disagree because the proof required to establish intentional wrongdoing is based upon the knowledge possessed by the employer, not the fact that an accident has not occurred over a particular period of time.
In Millison v. E.I. du Pont de Nemours & Co., 101 N.J. 161, 179, 501 A.2d 505 (1985), the New Jersey Supreme Court recognized that intentional wrongdoing is comprised of two components, (1)conduct and (2) context. Analyzing these two components, we observed in Mabee v. Borden, Inc., 316 N.J.Super. 218, 720 A.2d 342 (App.Div.1998), that the conduct factor may amount to intentional wrongdoing in one of two ways. Proof may be that there was (1) an actual intent to injure, i.e., having the desire to bring about given consequences, or (2) knowledge on the part of the offending party that the given consequences are virtually or substantially certain to result from a particular act. Id. at 227-28, 720 A.2d 342. Assuming that the conduct factor is present, the court is then required to also examine the context factor, whether the circumstances in which the injury occurred are "fairly ... viewed as a fact of life of industrial employment, or ... plainly beyond anything the Legislature could have contemplated as entitling the employee to recover only under the Compensation Act." Millison, supra, 101 N.J. at 179, 501 A.2d 505.
Applying these principles to the circumstances presented leads to the conclusion that plaintiff's case was prematurely dismissed on summary judgment. First, plaintiff's proofs are sufficient to establish the context component. In Mabee, we observed:
[I]t cannot be seriously argued that the Legislature expected that employers would deliberately ... remove safety devices because of profit motive or production concerns. Nothing in the statutory scheme suggests that the Legislature `anticipated' that this type of deliberate conduct `would be compensable under the terms of the Compensation Act and not actionable in an additional civil suit.'
[316 N.J.Super. at 233, 720 A.2d 342, citing Millison, supra, 101 N.J. at 179, 501 A.2d 505.]
The majority in this case recognizes that the employer's reprehensible conduct, by which it deceived OSHA representatives into thinking that the guard was used, does not, standing alone, fulfill the factual proof necessary to show substantial certainty. What they failed to say is that such deceitful conduct, though factually supportive of the conduct component, is conclusive evidence of the context component. The tying-off of the guard to placate OSHA inspectors is conduct which clearly *322 falls beyond that anticipated by the Legislature to be covered by the Compensation Act. It further supports an inference that the employer was aware of the need to provide the protection afforded by the mill's safety feature.
Discovery of critical evidence needed to establish AMI and Portman's appreciation of the risk and knowledge of the likelihood of injury, resulting from disengagement of the guard, was precluded by the entry of summary judgment. The essential issue is not the absence of virtual certainty in absolute terms as a result of the passing of some arbitrary period of time, but what knowledge was possessed by those who made the decision to remove the guard. Generally, a case is not ripe for summary judgment where the critical facts are not fully developed. Velantzas v. Colgate-Palmolive Co., Inc., 109 N.J. 189, 193, 536 A.2d 237 (1988) (citing Martin v. Educational Testing Serv., Inc., 179 N.J.Super. 317, 326, 431 A.2d 868 (Ch.Div.1981), overruled on other grounds, Brady v. Dep't of Personnel, 149 N.J. 244, 693 A.2d 466 (1997)); J. Josephson, Inc. v. Crum & Forster Ins. Co., 293 N.J.Super. 170, 203, 679 A.2d 1206 (App.Div.1996). Where a party opposing a motion for summary judgment is unable to file supporting papers because critical facts are particularly within the moving party's knowledge, the motion should be denied to permit the opposing party an opportunity for complete discovery. Bilotti v. Accurate Forming Corp., 39 N.J. 184, 206, 188 A.2d 24 (1963).
Actual knowledge or appreciation on the part of the offending party, that the act committed is substantially certain to result in given consequences, requires the same type of proofs as those required to show willful misconduct or malice. See Fielder v. Stonack, 141 N.J. 101, 124, 661 A.2d 231 (1995); Standridge v. Ramey, 323 N.J.Super. 538, 547-48, 733 A.2d 1197 (App.Div. 1999). Such conduct requires proof of an individual's state of mind. In Standridge, supra, 323 N.J.Super. at 548, 733 A.2d 1197, we recognized that in order to establish a defendant's state of mind, a plaintiff will generally be required to depose the defendant who is alleged to have acted willfully.
Here, the majority agrees with Judge Cramp that there was no basis to maintain an action against Portman given their determination that plaintiff was properly precluded from bringing an action for intentional wrongdoing against AMI. They also conclude that plaintiff failed to establish that Portman possessed any unique knowledge which would support the maintenance of a discovery action. I am constrained to disagree.
In dismissing plaintiff's complaint against Portman, Judge Cramp found:
[P]laintiff has all the information [he] needs to establish the case, including that ... the safety feature was being tied up.... [P]laintiff himself said at one point to Mr. Portman, we got a new guy here, ... [a] little less alert then we are, we ought to put this guard on .... the plaintiff participated in putting the guard back down when OSHA was coming.... [P]laintiff has all the information about Mr. Portman or other peoples's involvement in doing what was done.
The crucial fact is not so much what Portman did, but what he knew. Portman's knowledge, as the employer's representative, is essential to the determination of the employer's knowledge concerning the substantial or virtual certainty of future injury as a result of its decision to disengage the guard. It was Portman who ordered that the guard be made operational during OSHA inspections and tied off at all other times to facilitate production. When plaintiff expressed concern about safety on three separate occasions, Portman's purported responses "it was okay" and "not a problem" were at best ambiguous. Portman, perhaps more then anyone else, is the one person who could shed light on what, if any, appreciation AMI had concerning the risk of injury associated *323 with its decision. As the employer's representative, Portman's appreciation of the danger would be imputed to the employer. See Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 619-20, 626 A.2d 445 (1993). Portman's importance cannot be overstated. Precluding the discovery action against Portman prevented plaintiff from learning the information necessary to succeed against AMI. Neither defendant should have been dismissed pending completion of discovery of Portman's appreciation of the risk involved in tying off the guard.
The fact that the employer ordered and received the guard after the machine had arrived also supports an inference that the employer knew that it was necessary to prevent injury.[1] Finally, the certification of plaintiff's expert, Gerald Barnes, P.E., that, in his opinion, AMI knew that there was a virtual certainty of injury, has a bearing on our inquiry. Absent Portman's testimony, Barnes' initial conclusion may be considered to be a net opinion. It, nevertheless, underscores the need for further discovery to inquire into the actual knowledge possessed by the employer.
Certainly, the recognition of the likelihood of these types of injuries, which spawned the non-availability of contributory negligence as a defense to a products liability case arising in the work place is supportive of Barnes' initial views. Bexiga v. Havir Mfg. Corp., 60 N.J. 402, 290 A.2d 281 (1972). The potential circumstances here concerning inevitability of injury and lack of a meaningful choice, like those recognized in Suter v. San Angelo Foundry & Mach. Co., 81 N.J. 150, 406 A.2d 140 (1979), justify, at the very least, the need for additional discovery to ascertain the knowledge possessed by defendants Portman and AMI at the time they ordered the safety device disabled.
The use of passage of time as the primary factor for determining the absence of virtual certainty, effectively gives an employer, who intentionally removes a guard, the luxury of one free injury where a worker, by mere happenstance or luck, avoids the very consequences the guard is designed to prevent. While not intended, the majority's decision gives every employer a licence to remove safety devices, without being required to explain what they knew or should have known concerning the likelihood of injury to affected workers. I would therefore reverse the orders granting summary judgment in favor of Portman and AMI.
NOTES
[1] Occupational Safety and Health Administration.
[2] Since we conclude that the dismissal as to Portman was proper, we need not address his claim that the Hague Convention protects him from a discovery action because of his status as a German national. See Husa v. Laboratoires Servier SA, 326 N.J.Super. 150, 156, 740 A.2d 1092 (App.Div. 1999); Knight v. Ford Motor Co., 260 N.J.Super. 110, 113-16, 615 A.2d 297 (Law Div.1992).
[3] The manufacturer of this mill, defendant United Engineering and Foundry Co., Inc. and its successor Danieli United, settled with plaintiff.
[1] Unlike the facts in Mabee v. Borden, Inc. 316 N.J.Super. 218, 222, 720 A.2d 342 (App.Div. 1998) where the first injury occurred before the installation of a guard at the point of operation.