**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1925-21

KYLE BUSBY,

    Plaintiff-Appellant,

v.

SEABROOK BROTHERS & SONS,
INC., a/k/a SEABROOK FARMS,

    Defendant-Respondent,

and

MARTIN SPROCKET & GEAR, INC.,
MARTIN EQUIPMENT, INC.,
INDUSTRIAL SUPPLIES, INC.,
HUGHES EQUIPMENT COMPANY,
LLC, LYCO MANUFACTURING,
INC., and W.B. MACHINERY
CORPORATION,

    Defendants.

_____

Argued April 22, 2024 – Decided August 5, 2024

Before Judges Sabatino, Mawla, and Marczyk.

On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Docket No. L-0246-19.

Michael C. Shapiro argued the cause for appellant (Stark & Stark, attorneys; Christopher P. Weidman and Michael C. Shapiro, of counsel and on the briefs).

Kathleen O'Malley argued the cause for respondent (Duane Morris LLP, attorneys; Kathleen O'Malley and Kathryn R. Brown, on the brief).

PER CURIAM

This appeal concerns the application of the intentional wrong exception to the exclusionary provision of the New Jersey Workers' Compensation Act, N.J.S.A. 34:15-1 to -147. Plaintiff Kyle Busby appeals from the trial court's January 20, 2022 order granting summary judgment in favor of his employer, defendant Seabrook Brothers & Sons, Inc. a/k/a Seabrook Farms ("Seabrook"). Based on our review of the record and the applicable legal principles, we affirm.

I.

Seabrook is a business that processes and packages frozen vegetables for resale. Seabrook hired plaintiff in January 2017. On April 19, 2017, plaintiff injured his right hand while cleaning a commercial mixing machine that became activated. The machine was owned and controlled by Seabrook.

The mixing machine at issue, referred to as "Line 9," mixed vegetables that were fed into the machine through three top-loaded bins called "hoppers,"

then passed through corresponding "feeder(s)" and onto the conveyor, also referred to as a trough, where a rotating auger mixed and moved the product down the conveyor. According to plaintiff's expert, the auger's proximity to the walls of the trough created an "in running nip" or "nip point," a "hazard that occurs where a part rotates close to a surface . . . [and] can pull items and body parts into [a] gap."

Defendant purchased the top, hopper component, of Line 9 from a manufacturing company in 2011. The top component was offered for sale in tandem with a corresponding conveyor system, which had a grate with one-and-one-half-inch-spaced bars covering the top of the conveyor. Defendant declined to purchase the conveyor because it had a used one in storage that it planned to repurpose. The conveyor utilized on Line 9 had a solid sheet of metal covering the top of the conveyor. Unlike the grated guard designed for the conveyor system, defendant's repurposed guard did not have openings to allow forced air to blow food remnants out of the auger. As a result, the repurposed guard had to be removed to clean the auger with an air hose.

The parties dispute whether the repurposed guard was on the conveyor during regular operation of Line 9. Three former employees testified that the guard was often not on Line 9. On the other hand, W.E. Seabrook, Vice

3

President of Engineering for Seabrook, testified that the guard could only be removed by the mechanics because they were the only ones with the tools necessary to unbolt the guard from the machine. However, he also testified that the dumpers[1] were able to remove the guard when cleaning the machine.

Defendant understood that, because the guard had to be removed for changeover[2] cleanings, lockout/tagout ("LOTO")[3] procedures had to be followed

---

[1] Production Lines 7 and 9 were the "mix line" machines, and the employees working them made up the "mix crew." Line 9 was operated by two line workers, or "dumpers": one was positioned at the top level of the machine, dumping frozen vegetables into the hoppers; the other was positioned at the bottom level, filling totes with the mixed product as it was transported down the conveyor.

[2] Each of the production lines were cleaned by the sanitation crew at night, once both shifts had ended. The production lines also needed to be cleaned during shifts when a "changeover" from one vegetable blend to another was required ("changeover cleanings"), such as if the line was mixing peas and carrots and needed to switch to a broccoli blend. The sanitation crew performed these mid-shift cleanings as well—except for Lines 7 and 9. The dumpers of Lines 7 and 9 were tasked with cleaning their respective machines whenever changeovers were required.

[3] "Lockout" means the "placement of a lockout device on an energy isolating device, . . . ensuring that the energy isolating device and the equipment being controlled cannot be operated until the lockout device is removed." 29 C.F.R. § 1910.147(b) (2011). "Tagout" means the secure fastening of a "prominent warning device" to an "energy isolating device . . . to indicate that the energy isolating device and the equipment being controlled may not be operated until the tagout device is removed." Ibid. LOTO procedures, set forth in federal regulations and enforced under the auspices of the Occupational Safety and

4

to prevent injury by ensuring the machine was not activated during the cleaning process. Defendant also knew that the auger was dangerous if it did not have its guard on and became activated.

The dumper working Line 9's conveyor component cleaned it for changeovers by holding an air hose close enough to the auger so that the force expelled from the hose could blow out vegetable remnants from the conveyor. Plaintiff was never trained on performing a changeover cleaning on Line 9. Mechanics were the only employees trained on LOTO. Dumpers, other line workers, mix crew leaders, and shift and repack supervisors were not trained on LOTO. W.E. Seabrook testified he assumed employees would learn about LOTO procedures for Line 9 cleanings by word of mouth from other line workers, but he admitted defendant had no system in place to ensure that information was communicated.

In 2012, OSHA performed a series of inspections targeting chemical safety at defendant's plant. As a result of the inspections, OSHA cited defendant

---

Health Administration ("OSHA"), are designed to control the release of hazardous energy during servicing, cleaning, and other maintenance. 29 C.F.R. § 1910.147 (2011). LOTO procedures include de-energizing and locking all sources of power capable of causing unexpected energy surges/activation of a machine, and placing a tag at the lock, identifying who is working on the machine.

for violations of OSHA's LOTO regulations related to Seabrook's "ammonia room." OSHA required defendant to abate the violations. The parties dispute whether defendant abated the LOTO violations prior to plaintiff's injury.[4]

Against this backdrop, we address plaintiff's accident in further detail. Plaintiff had been working for defendant for approximately three months at the time of the incident, though he had only been working in the cold room[5] for less than a week when his injury occurred. It was his first time cleaning machinery at the plant. The cold room supervisor did not provide instructions to him, but his fellow dumper told him "to blow with the air blower. Just go, stream the air blower through it." Plaintiff used the power switch on the left side of the conveyor to turn Line 9 off before he began cleaning it. It had not, however, been subjected to the LOTO safety process. Plaintiff had not been trained on LOTO procedures.

There was no guard on the auger when plaintiff was cleaning it. The record does not indicate whether plaintiff removed the guard or if it was absent, but the parties agree that the auger could not be cleaned with an air hose without

---

[4] This issue is discussed in section III. D. below.

[5] Each of defendant's eight production lines—including Line 9—was located in the "cold room," a separate, refrigerated room within the repack area of defendant's plant.

A-1925-21

the guard from the trough being removed. Plaintiff had been cleaning the machine for twenty to thirty seconds when it suddenly became activated, pulling the hose he was using—along with his hand—into the unguarded auger. Plaintiff could not see the auger moving inside the trough or hear that it had been activated.

The parties do not dispute that Line 9 became activated, although it is unclear how the activation occurred.[6] An employee working quality control on the mix-line crew the day of the incident testified that he believed the auger started moving because someone turned Line 9 back on. He saw the other dumper that was working on Line 9 that day standing near the on/off switch located on the conveyor at the time of plaintiff's injury. He thought the dumper turned Line 9 back on because he was talking to someone and was distracted.[7]

A former employee testified that he experienced and witnessed "close calls" of near injuries when air hoses were pulled into the unguarded auger

---

[6] Defendant asserts Line 9 was activated due to an unexpected energy surge, rather than someone turning the machine back on; however, there is no evidence in the record to substantiate this theory.

[7] Two former employees that were working on Line 7 at the time of the incident testified that they saw Line 9 become activated while plaintiff was cleaning it, and they also believed the other Line 9 dumper was responsible for turning it back on because they saw him standing near the switch.

7 <span>A-1925-21</span>

during "changeover" cleanings on Line 7, but he never reported either instance to a supervisor. Plaintiff was the first employee to report an injury related to the auger on Line 9.

On April 18, 2019, plaintiff instituted a personal injury action against his employer, defendant Seabrook,[8] alleging Seabrook's actions created such a "substantial certainty" of harm that they constituted intentional wrongs. Plaintiff's engineering expert opined Seabrook's removal of the guard during the cleaning process without LOTO procedures in place, combined with the failure to train plaintiff, resulted in plaintiff's exposure to the running nip between the trough and the rotating auger and created a substantial certainty of harm.

Seabrook moved for summary judgment. The court heard argument on January 21, 2022, and rendered an oral opinion granting the motion. In the court's oral opinion, it determined Seabrook did not engage in any "deliberate acts or affirmative acts" that led to plaintiff's injury. The court deemed it immaterial that the guard was absent from the trough at the time of plaintiff's

---

[8] Plaintiff also initially asserted product liability claims against defendants Martin Sprocket & Gear, Inc., Martin Equipment, Inc., and Industrial Supplies, Inc. Plaintiff subsequently filed an amended complaint to assert product liability claims against defendants Hughes Equipment Co., LLC, Lyco Manufacturing, Inc., and W.B. Machinery Corporation. These product liability defendants were ultimately dismissed.

injury because the guard was utilized to prevent injuries during the normal operation of the machine, and it had to be removed to clean the machine. Instead, the court attributed the accident to defendant's failing to have LOTO procedures in place and failing to train plaintiff on how to clean the machine. It determined that both failures were more akin to negligence than deceit or an affirmative act by Seabrook. Consequently, the court held that defendant did not commit an affirmative act in relation to plaintiff's injury.

The court also found that there was no evidence of prior injuries on Line 9. It further determined Seabrook was unaware of prior close calls, and it did not engage in any deception. It considered defendant's 2012 OSHA citations for LOTO violations in the ammonia room largely irrelevant. The court declined to find that the injury was virtually certain to happen because there was not enough "bad conduct on behalf of the employer" to establish this accident "was virtually certain to happen." The court ultimately held that neither prong of the intentional wrong test was satisfied and granted defendant's motion for summary judgment.

## II.

Plaintiff contends he raised material issues of fact regarding the "conduct" and "context" prong of the substantial certainty test, and the court erred in

9

granting summary judgment.  Plaintiff further argues the court granted summary judgment without proper consideration of plaintiff's expert report.  He also asserts the court improperly considered evidence outside the record by considering Seabrook's certification and other documents related to the 2012 OSHA violations.  We address these issues in turn below.

In reviewing a summary judgment decision, we measure the motion court's findings and conclusions against the standards laid out in Brill v. Guardian Life Insurance Co. of America, 142 N.J. 520 (1995).  Those standards are well-established:  summary judgment should be granted when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law."  Brill, 142 N.J. at 528-29 (quoting R. 4:46-2(c)).  Issues of law are subject to the de novo standard of review, and the trial court's determination of such issues is accorded no deference.  Kaye v. Rosefielde, 223 N.J. 218, 229 (2015).

## A.

Plaintiff contends he presented competent evidence to create an issue of fact with respect to both prongs of the substantial certainty test.  He asserts that

cleaning the conveyer without the guard was "common practice," and this in turn created a situation that was "substantially certain" to cause an injury and is the "sort of intentionality" recognized in our caselaw. He further notes his expert makes clear that the rotating auger "in close proximity to the trough . . . creates an in-running nip," which can pull body parts into the gap and that cleaning the unguarded machine was extremely dangerous.

Plaintiff maintains the facts here are similar to Laidlow v. Hariton Machinery Co., Inc., where a safety guard was removed creating a nip point resulting in a risk of injury. 170 N.J. 602, 607-10, 620 (2002). He further relies on Mull v. Zeta Consumer Products, asserting the employer's removal of a safety device combined with other factors, such as ignoring safety complaints and OSHA citations, was sufficient to satisfy both prongs of the substantial certainty test. 176 N.J. 385, 392-93 (2003).

Plaintiff next argues under Mabee v. Borden, Inc., that an affirmative act by an employer is not required to show an intentional wrong when, as was the case here, the injury was caused by the absence of a safety guard. 316 N.J. Super. 218, 231 (App. Div. 1998). Accordingly, plaintiff asserts the trial court erred in granting summary judgment based on Seabrook not engaging in an affirmative act.

11

Plaintiff further contends Seabrook's failure to train its mix-line workers on LOTO procedures when dangerous machinery is being cleaned created a substantial certainty of injury. He asserts that had the LOTO procedures been in place, and properly followed, his injury would not have occurred. The failure to train the mix-line employees, including plaintiff, was compounded by the fact that his supervisors were also not trained. This satisfied another factor considered by the courts, namely, whether employees are adequately trained on general safety and operation of the machinery at issue. Moreover, plaintiff notes OSHA had previously issued a LOTO citation to Seabrook prior to his injury. He argues Crippen v. Central Jersey Concrete Pipe Co., is analogous to the facts in this matter as it also involved an employer who failed to employ LOTO procedures and failed to properly train its employees. 176 N.J. 397, 410 (2003).

Plaintiff next argues Seabrook exerted pressure on its employees to work quickly, failed to employ a system for "close call" reporting, and disregarded safety complaints. He cites a prior supervisor's testimony that she complained to management about safety issues and the lack of training for the employees regarding cleaning duties. Plaintiff contends these facts support an inference that his injury was "substantially certain" to occur.

12

Plaintiff further argues Seabrook's acts and omissions, as outlined above, are beyond anything the Legislature intended to immunize, thus satisfying the context prong under Laidlow, 170 N.J. at 622-23. He claims his injury was not a result of ordinary foreseeable work hazards, but resulted from abnormally unsafe practices. Plaintiff maintains the employers in Laidlow, Mull, and Crippen, like Seabrook, engaged in a long-term pattern of ignoring safety concerns and exposing employees to unnecessary risk without providing proper training.

B.

The Workers' Compensation Act embodies "an historic 'trade-off' whereby employees relinquish their right to pursue common-law remedies in exchange for prompt and automatic entitlement to benefits for work-related injuries." Laidlow, 170 N.J. at 605 (citing Millison v. E.I. Du Pont de Nemours & Co., 101 N.J. 161, 174 (1985)). The Act's remedy is generally exclusive, "except for injuries that result from an employer's 'intentional wrong'; for those, an injured employee is permitted to maintain a common-law tort action against the employer." Van Dunk v. Reckson Assoc. Realty Corp., 210 N.J. 449, 451 (2012) (citing N.J.S.A. 34:15-8). The statute states, in pertinent part:

> If an injury or death is compensable under this article, a person shall not be liable to anyone at common

law or otherwise on account of such injury or death for any act or omission occurring while such person was in the same employ as the person injured or killed, except for intentional wrong.

[N.J.S.A. 34:15-8.]

"[T]he modern understanding of the intentional-wrong exception to the Act's exclusive remedy provision" began with the Supreme Court's decision in Millison. Van Dunk, 210 N.J. at 459. The Millison Court examined the "essential question" of "what level of risk-exposure is so egregious as to constitute an 'intentional wrong.'" 101 N.J. at 177. Ultimately, the Court expanded the concept of "intentional wrong" to include not only actions taken with a subjective desire to harm, but also instances where an employer knows that the consequences of its acts are "substantially certain" to result in harm. Id. at 177-78. In adopting the substantial certainty standard, the Court acknowledged "that every undertaking, particularly certain business judgments, involve some risk, but that willful employer misconduct was not meant to go undeterred." Id. at 178.

Millison also added a second component to the "intentional wrong" test, requiring courts to examine "the context in which that conduct takes place." Id. at 178-79. The Laidlow Court succinctly summarized the holding in Millison by noting,

in order for an employer's act to lose the cloak of immunity of N.J.S.A. 34:15-8, two conditions must be satisfied: (1) the employer must know that his actions are substantially certain to result in injury or death to the employee, and (2) the resulting injury and the circumstances of its infliction on the worker must be (a) more than a fact of life of industrial employment and (b) plainly beyond anything the Legislature intended the Workers' Compensation Act to immunize.

[170 N.J. at 617 (discussing Millison, 101 N.J. at 177-78).]

The first condition has become known as the "conduct" prong, and the second as the "context" prong. Id. at 614-15. Courts have found an employer's intentional wrong "in only rare and extreme factual circumstances." Kibler v. Roxbury Bd. of Educ., 392 N.J. Super. 45, 52-53 (App. Div. 2007).

Applying that test to the facts before it, the Millison Court held that the plaintiffs' claims concerning their contraction of work-related diseases caused by their employer knowingly exposing them to asbestos failed to vault the substantial certainty threshold because more than "mere knowledge and appreciation of a risk—even the strong probability of a risk" was required. Millison, 101 N.J. at 179. However, the plaintiffs' claims that the company doctors fraudulently concealed their already-contracted work-related diseases so they could continue working under the same hazardous conditions, thereby

15

aggravating their illnesses, satisfied both prongs of the intentional wrong test. The Court explained:

> These allegations go well beyond failing to warn of potentially-dangerous conditions or intentionally exposing workers to the risks of disease. There is a difference between, on the one hand, tolerating in the workplace conditions that will result in a certain number of injuries or illnesses, and, on the other, actively misleading the employees who have already fallen victim to those risks of the workplace. An employer's fraudulent concealment of diseases already developed is not one of the risks an employee should have to assume. Such intentionally-deceitful action goes beyond the bargain struck by the [Workers'] Compensation Act.
>
> [Id. at 182.]

In Laidlow, the Court clarified that determining whether the prongs of the intentional wrong test are met is based on the "totality of the facts contained in the record." 170 N.J. at 623. The Court also explained that, while the same facts and circumstances will generally be relevant to both prongs of the intentional wrong test, a court deciding a defendant's summary judgment motion must make two separate inquiries. Ibid.

Laidlow involved an employee whose fingers were partially amputated when he caught his hand in a rolling mill he operated without a safety nip guard. Id. at 606-07. Throughout the approximately twelve to thirteen years of the

16

plaintiff's employment, the safety guard was never operational and, according to the plaintiff, was only put in place when OSHA inspectors came to the plant. Id. at 608. There was no history of prior accidents on the machine, though management was aware of two prior "close calls" with the nip point on the machine. Id. at 607-08. The plaintiff had complained about the absent guard to his supervisor on three prior occasions. Id. at 608. The professional engineer hired as the plaintiff's liability expert opined the employer knew with "virtual certainty" that an injury from the unguarded mill would occur. Id. at 608-09.

Reversing the trial court's grant of summary judgment in favor of the defendant, the Court held that a jury question existed as to whether the employer knew "that it was substantially certain that the removal of the safety guard would result eventually in injury to one of its employees." Id. at 622. The Court found particularly important that management was aware of prior close calls and the seriousness of the potential injury, that the plaintiff previously complained about the unguarded nip point, and that the employer had deliberately and systematically deceived OSHA, which, it concluded, revealed its "guilty knowledge" of the likelihood of substantial injury. Ibid.

The Court in Laidlow was unpersuaded by the defendant's argument that the absence of prior accidents precluded a finding of "substantial certainty."

17

Ibid. It explained that, while prior accidents can evidence an employer's knowledge as to the likelihood of death or injury, no single fact is determinative of the intentional injury test, as its disposition requires consideration of "all surrounding circumstances" in the record. Id. at 621-22.

The Court held the context prong was also satisfied, stating:

> [I]f an employee is injured when an employer deliberately removes a safety device from a dangerous machine to enhance profit or production, with substantial certainty that it will result in death or injury to a worker, and also deliberately and systematically deceives OSHA into believing that the machine is guarded, we are convinced that the Legislature would never consider such actions or injury to constitute simple facts of industrial life.
>
> [Id. at 622.]

In Mabee, the plaintiff operator was injured when her hand got caught in a labeling machine she was cleaning. 316 N.J. Super. at 221. Eleven months before the accident, the defendant employer had installed a "V" shaped guard over the nip point of the machine. Id. at 231. The guard was removed shortly thereafter, and the employer installed a plexiglass cover with an interlock mechanism that automatically shut the machine down whenever the plexiglass doors were opened. Id. at 222. To permit access for maintenance purposes, the

18

employer also installed a bypass switch that allowed the machine to continue running even though the plexiglass cover was removed.  Id. at 222-24.

The plaintiff introduced evidence suggesting that, at the encouragement of employer personnel, the bypass switch was left in "maintenance mode" at least ninety-five percent of the time, to allow operators to save time and increase production by cleaning the machine while it was running.  Id. at 231.  We determined, "a factfinder could reasonably conclude that the [plexiglass] guard was essentially rendered ineffectual."  Id. at 232.  The employer knew that fifteen months before the plaintiff's injury, another employee injured their hand in the unguarded machine while performing the same cleaning procedure as the plaintiff.  Id. at 231.  The report from the plaintiff's liability expert, a professional engineer, opined that the bypass switch installed by the employer created a virtual certainty of injury.  Id. at 232.  We held that a jury question existed as to whether the employer knew with substantial certainty that a machine operator would be injured when it "deliberately removed one safety guard and essentially nullified the effectiveness of the second."  Ibid.

In Mull, the plaintiff suffered amputation of two fingers when the unguarded "winder" machine, while in the "off" setting, suddenly began to operate, pulling the plaintiff's hand into the machine.  176 N.J. at 387-88.

19

Another line operator had previously been injured by his hand being pulled into the winder, though in a somewhat different manner than the plaintiff's. Id. at 388. This same employee had also complained about safety-related issues "but nothing seemed to be done." Ibid. Another co-employee certified he complained to management about a prior close call where he was almost injured by the machine, and he also relayed safety concerns—including the winder's ability to start up suddenly—to no avail. Id. at 388-89. OSHA had previously cited the defendant for failing to provide its employees with LOTO procedures. Ibid. Prior to the accident involving the plaintiff, the employer removed the original safety device on the machine and rewired it to restart automatically when a separate bagging machine was energized. Ibid.

The Mull Court noted the facts were similar to Laidlow and held that they could support a reasonable jury finding that the defendant knew that its alterations to the winder were substantially certain to result in injury to an employee. Id. at 392. The Court determined the plaintiff had demonstrated that prior to the accident the employer disengaged the safety device; an employee was injured on the same winder machine; another worker had experienced a close call and was nearly injured; and a worker had complained the machine could suddenly start up, creating a hazard. Id. at 389-92.

In Crippen, the plaintiff sued her deceased husband's employer, arguing that the defendant's deliberate failure to correct "serious" OSHA violations constituted an intentional wrong under the exception to the Workers' Compensation Act's exclusive remedy provision. 176 N.J. at 400-03. The decedent had been employed as a "material man," a position that entailed walking across a narrow plank laid atop hoppers approximately seventeen feet deep, located in an elevated shed known as the "change-over" room. Id. at 399. The maneuver "consumed less than two minutes and was performed approximately ten times a day." Id. at 400. On the day of the accident, the decedent fell from the plank into a hopper, was covered with sand, and suffocated. Id. at 400.

Prior to the decedent's accident, OSHA had inspected the plant and cited the defendant for several violations. Id. at 402-03. "Serious" violations concerning the changeover room included the defendant's failure to: "identify permit-required confined spaces"; "develop and implement a 'written permit space entry program'"; implement a LOTO procedure; and train employees on LOTO procedures. Id. at 401-04. OSHA categorized the violations as "serious," which meant "that the condition can result in 'a substantial probability [of] death or serious physical harm.'" Id. at 403 (alteration in original) (quoting 29 C.F.R.

§ 1960.2(v)). OSHA ordered the defendant to abate the violations by February 1997—approximately sixteen months before the decedent's accident. Id. at 402-03.

Deposition testimony from the defendant's safety manager revealed that he knew an employee could die if the OSHA violations were not abated. Id. at 410. He stated that "he, the [g]eneral [m]anager, and the [p]lant [m]anager, intended to satisfy the OSHA citations first and finish the implementation later." Id. at 403. The plaintiff submitted an expert report from an engineer who opined that the "serious" nature of the OSHA violations made the defendant aware of the "hazardous and dangerous" conditions at its plant, and the defendant's "deliberate, intentional decision" not to address the violations caused the decedent's accident. Id. at 404. The report explained how the OSHA-mandated procedures that the defendant failed to implement would have prevented the accident: for example, had a proper LOTO procedure been in place, the mixer operator would not have been able to operate the gate that discharged the sand over the decedent's body. Ibid.

The Court held "a jury reasonably could conclude that [the] defendant had knowledge that its deliberate failure to cure the OSHA violations would result in a substantial certainty of injury or death to one of its employees." Id. at 409.

The Court also found that the defendant deliberately failed to correct the OSHA violations and "intentionally deceived OSHA into believing that it had abated the violations because it did not want OSHA to return to the plant" and stated "[b]y its deception, a jury could conclude that [the defendant] evidenced an awareness of the 'virtual' certainty of injury from" its failure to correct the safety hazards. Id. at 410 (quoting Laidlow, 170 N.J. at 621) (internal quotation marks omitted). The Court opined the defendant's failure to implement the programs required by OSHA created a substantial certainty that an injury or death would result from the dangerous conditions in the changeover room. Ibid.

Recently, Van Dunk clarified that the employer's affirmative act must generally be a persistent or continuing occurrence. 210 N.J. at 471.[9] The employee in Van Dunk was injured when the on-site supervisor made a "quick but extremely poor decision" to send the employee into a trench to perform a brief task without employing the protective devices required by OSHA. Id. at 471. The Court compared that isolated decision, regarding a task that could be completed within a few minutes, with the continuing and persistent aspect of the employers' affirmative acts in Crippen, 176 N.J. at 410 (the defendant failed to

_____

[9] The Court acknowledged the possibility that "a single egregiously wrong act by an employer might, in the proper circumstances, satisfy the intentional-wrong standard . . . ." Id. at 474.

correct OSHA violations for eighteen months prior to plaintiff's death), and Laidlow, 170 N.J. at 608 (the defendant's deliberate decision to remove safety devices spanned thirteen years). Van Dunk, 210 N.J. at 471. Ultimately reversing the denial of summary judgment in favor of the employer, the Court held there was no "objectively reasonable basis" for concluding that the defendant's single, spontaneous violation of safety protocol to perform a brief task "was substantially certain to lead to injury or death." Id. at 472.

The Van Dunk Court noted certain commonalities among cases in which it found an intentional wrong: "Millison, Laidlow, Crippen, and Mull . . . all involved the employer's affirmative action to remove a safety device from a machine, prior OSHA citations, deliberate deceit regarding the condition of the workplace [or] machine, . . . knowledge of prior injury or accidents, and previous complaints from employees." Id. at 471. The Court also noted that recklessness and gross negligence are insufficient to meet the intentional wrong standard. Id. at 452. "[T]he dividing line between negligent or reckless conduct on the one hand and intentional wrong on the other must be drawn with caution, so that the statutory framework of the [Workers' Compensation] Act is not circumvented simply because a known risk later blossoms into reality." Hocutt v. Minda

Supply Co., 464 N.J. Super. 361, 375 (App. Div. 2020) (quoting Millison, 101 N.J. at 178).

The above cases are all distinguishable from the matter before us. Mull is distinct from the present case because the employer there—unlike Seabrook— had notice of prior injuries, a history of close calls, disengaged a safety device that allowed the machine to be unguarded while operating, and LOTO-related OSHA violations related to the equipment at issue. Mull, 176 N.J. at 392.

Mabee also involved dissimilar facts. 316 N.J. Super. at 221-25. There, the employer removed a guard and installed a bypass switch for the purpose of allowing the subject machine to run, even though the previously installed plexiglass cover and interlock device would have shut the machine down when the plexiglass was lifted. Id. at 222. Moreover, another employee had previously been injured performing the same cleaning procedure. Id. at 231.

The machines in Mabee and Mull were at risk of turning on because of an affirmative act by the employer. Whereas, here, Line 9 was at risk of turning on because of defendant's failure to implement LOTO procedures, which the trial court reasonably deemed tantamount with negligence—not an intentional act.

Moreover, the intentional or fraudulent deception by the employers in Millison, Laidlow, and Crippen is also not present in the matter before us. Those cases involved employees who were required to run equipment with the guards off, or the employers disengaged safety devices designed to protect the employees. Here, plaintiff was ultimately injured when the equipment was energized unexpectedly when he attempted to clean it. Furthermore, although the guard was removed at the time plaintiff was cleaning Line 9,[10] plaintiff knew the machine should not be cleaned when it was running.

As the court noted, the machine was energized, due in part, to Seabrook's failure to implement LOTO procedures. That alone, however, is not enough to satisfy the virtual certainty requirement under Laidlow. 170 N.J. at 618-21. W.B. Seabrook testified Line 9 should not be cleaned when the machine is on, and plaintiff recognized the machine "absolutely" should be off while it is cleaned. Plaintiff further testified he was not told by his supervisor to hurry or rush in cleaning the machine. Rather, he stated, "[i]t was a work hard job. It

---

[10]    The Court in Laidlow noted its holding was "not to be understood as establishing a per se rule that an employer's conduct equates with an 'intentional wrong' . . . whenever that employer removes a guard . . . from the equipment . . . or commits some other OSHA violation." Id. at 622-23. Rather, cases must be analyzed based on "the totality of the facts contained in the record." Id. at 623.

A-1925-21

was never a rush job." Under these facts, plaintiff falls short of establishing an intentional wrong.

We are unconvinced by plaintiff's argument that no affirmative act was legally required when his injury was caused by the absence of a safety guard. Our Supreme Court has consistently held that an employee's injury must have been caused by an employer's affirmative, deliberate act in order to constitute an "intentional wrong" for purposes of the exclusionary provision of the Workers' Compensation Act. An employer's "mere toleration" of known hazards "'will come up short' of substantial certainty." Laidlow, 170 N.J. at 616 (quoting Millison, 101 N.J. at 179).

An employer's violation of safety regulations or failure to follow good safety practice cannot sustain a finding of intentional wrong unless it is "accompanied by something more, such as deception, affirmative acts that defeat safety devices, or a willful failure to remedy past violations." Bove v. AkPharma Inc., 460 N.J. Super. 123, 142 (App. Div. 2019). Consequently, defendant's failure to train plaintiff on how to clean the machine and to have LOTO procedures in place were reasonably found to be insufficient affirmative acts to establish an intentional wrong.

27

The court here found that plaintiff's accident was caused by someone turning the machine back on after plaintiff had started cleaning it. It also found that had LOTO procedures been in place, plaintiff's injuries would not have occurred, but it determined "there was no deliberate or affirmative act by the employer in that regard." The court considered defendant's 2012 OSHA citations for LOTO violations largely irrelevant. It expressed doubt as to the prior OSHA violations' relevance to plaintiff's injury based on the difference between the machines and areas of the plant at issue. The court also found that plaintiff failed to show a genuine issue as to substantial certainty because there was no evidence of previous injuries on Line 9, defendant's awareness of prior close calls, or deception by defendant.[11] The court's findings regarding absence of prior injuries and defendant's lack of deception regarding the OSHA

---

[11] Although one supervisor testified that she complained generally about why her employees had to clean the machines, as opposed to the sanitation crew, she did not specify any particular safety concerns regarding the cleaning of Line 9. For example, when asked if it was her "responsibility to make sure that someone with experience cleaning that line trained [plaintiff] on how to clean [it]," she responded: "You would think so, but . . . [i]t was never an issue. I complained about them even cleaning the machine. . . . Why are they cleaning the machine? You have . . . sanitation here. Why is it just my machines, my guys have to clean them?" She further testified, "[t]hey're getting wet. They had to sometimes use water . . . [and] [w]e're in a cold room . . . . I didn't think it was fair. . . . [T]he other dumpers" did not have to clean the machines.

A-1925-21

violation, though not dispositive, were properly considered as part of the totality of the circumstances surrounding plaintiff's claim.

This was not a situation where plaintiff was exposed to the auger when processing vegetables on Line 9. Changeover cleanings using the air hose were not supposed to be performed while the machine was running. Thus, it was not defendant's assembly of Line 9 with a guard that had to be removed for cleanings that caused plaintiff to be exposed to the machine's moving auger. Rather, it was the need for the guard to be removed for cleanings—together with defendant's failure to implement LOTO procedures—which caused plaintiff to be exposed to the hazard of the moving auger. Noncompliance with OSHA alone, however, does not rise to the level of intentional wrong. Bove, 460 N.J. Super. at 142 ("[I]n addition to violations of safety regulations or failure to follow good safety practice, an intentional wrong will be found when it is accompanied by something more, such as deception, affirmative acts that defeat safety devices, or a willful failure to remedy past violations.").

Although Seabrook had LOTO protocols in place, it acknowledged plaintiff was not trained in LOTO procedures. This failure-to-train allegation, however, even if viewed as negligent or grossly negligent, does not rise to the level of an intentional wrong. That is, plaintiff's injury stemming from

29

insufficient training—in view of the totality of the circumstances in this matter—did not make plaintiff's injury a virtual certainty, particularly where plaintiff understood that Line 9 should have been powered off during the cleaning process.

Plaintiff's expert opines Seabrook "should have employed an adequate LOTO program and trained [plaintiff] in its use," and by not doing so Seabrook "failed to follow good industry practice." Although that may be the case, we cannot say, under the facts here, that this failure to follow the industry practices—which may have been negligent or even grossly negligent—was equivalent to an intentional wrong. We do not view Seabrook's actions either individually or cumulatively as satisfying the high bar to establish the intentional wrong exception, and therefore plaintiff failed to satisfy the conduct prong under Laidlow, 170 N.J. at 622-23.

The court properly determined there was no evidence of deliberate deceit on the part of Seabrook, or prior accidents or close calls involving Line 9 while it was being cleaned, to put Seabrook on notice that plaintiff's accident was a "virtual certainty." The absence of willful and culpable acts on the part of Seabrook provided support for the court's conclusion that plaintiff did not satisfy the conduct prong. Accordingly, Seabrook's conduct here, even when viewed

in a light most favorable to plaintiff, does not rise to the level of an intentional wrong.

We conclude the trial court correctly determined plaintiff failed to demonstrate that Seabrook engaged in conduct knowing it to be "a virtual certainty that bodily injury or death [would] result." Van Dunk, 210 N.J. at 470. Because the court did not err in addressing the conduct prong, we need not address the context prong. Id. at 461 (failure to establish either prong forecloses an employee's tort claims against an employer).

C.

Plaintiff next argues that the court's failure to reference his liability expert report in granting defendant summary judgment was reversible error. Plaintiff also argues that summary judgment is inappropriate in an intentional wrong case whenever an unopposed expert report concludes that a defendant was "substantially certain" that an injury would occur.

The report of plaintiff's liability expert examined whether defendant's "actions or inactions" caused plaintiff's accident, and ultimately concluded that defendant "should have been substantially certain that an injury would occur." The expert attributed plaintiff's incident to defendant: permitting the guard to be removed during cleanings; failing to have LOTO procedures in place; and

31

failing to train dumpers on how to clean the line.

"Generally, a trial court should consider all of the information it knows to be available when evaluating a motion for summary judgment, including an expert's report." Gross v. TJH Auto. Co., 380 N.J. Super. 176, 190 n.4 (App. Div. 2005) (citing Ziegelheim v. Apollo, 128 N.J. 250, 264 (1992)). However, neither of the cases plaintiff cites support his assertion that a court's failure to consider an expert report constitutes reversible error in and of itself.

In Ziegelheim, a legal malpractice case, the Supreme Court commented that the trial court would have erred in ruling against the plaintiff had it not considered the expert reports, since they contained conflicting factual contentions regarding the appropriate standard of care, creating a genuine dispute that precluded summary judgment. 128 N.J. at 262-65. However, the Court implicitly found that the trial court had considered the report because the record evidenced its awareness of the "basic point" of the report. Id. at 264.

In Atlantic Paradise Associates, Inc. v. Perskie, Nehmad & Zeltner, 284 N.J. Super. 678, 685-87 (App. Div. 1995), the trial court stated it had not considered the plaintiff's expert report in rendering its decision, despite the court's (mistaken) belief that expert testimony was necessary to establish an element of the plaintiff's claim. We noted that, had the trial court been correct

that an expert opinion was required to establish the plaintiff's claim, it would have erred in not reviewing the report. Id. at 686. Since the report was not required, the court's failure to review it was inconsequential. Ibid.

Unlike Atlantic Paradise, the court here found that plaintiff's incident had been caused by two of the same factors that plaintiff's expert had attributed to causing the incident and considered, but ultimately disregarded, the third.[12] The court's discussion addressing the same factors discussed in plaintiff's report suggests it considered the opinion set forth therein. Consequently, we find no error.

Plaintiff's argument that summary judgment is inappropriate in an intentional wrong case if an unopposed expert report supports a contrary conclusion by opining that a defendant's conduct made a plaintiff's injury a "substantial certainty" does not persuade us there was error here. While Mull, Laidlow, and Mabee held that sufficient evidence of "substantial certainty" existed to preclude summary judgment, and were based, in part, on an expert's

---

[12] The court considered the issue of the guard "somewhat of a red herring" because it "had to be removed to clean the machine out." Instead, it attributed the accident to defendant's failure to have LOTO procedures in place and the failure to train plaintiff on how to clean the machine, and it determined that both failures were more akin to negligence than deceit or an affirmative act by defendant. Consequently, the court held that defendant did not commit an affirmative act in relation to plaintiff's injury.

opinion that the employer would have been substantially certain that injury would result from its actions, their holdings were also based on other evidence in the record. See Mull, 176 N.J. at 392 (holding jury could find substantial certainty based on the plaintiff's expert report, in addition to a prior accident on the machine, previous safety complaints, and OSHA's prior citations, all known to the employer); see also Laidlow, 170 N.J. at 622 (holding jury could find substantial certainty "in light of all [the] surrounding circumstances, including" close calls, the seriousness of any potential injury, prior complaints, and deception of OSHA).[13]

The court appropriately entered summary judgment because it found that defendant's conduct in relation to plaintiff's accident was more akin to negligence than an intentional wrong. Consequently, consideration of the expert report, which rooted Seabrook's culpability based on its failure to follow sound industry practices, did not require the court to deny summary judgment.

---

[13] In Tomeo, the Court affirmed our finding that "there was a lack of evidence" of substantial certainty "substantially for the reasons expressed by that court," as set forth in a lengthy excerpt that included the statement "[t]here is no expert testimony or other evidence suggesting defendant knew that disabling the safety device was substantially certain to harm plaintiff." Tomeo v. Thomas Whitesell Constr. Co., 176 N.J. 366, 374-75 (2003). At most, the opinion's inclusion of the phrase about the lack of expert testimony acknowledges the possibility—not obligation—of sustaining a substantial certainty finding with expert testimony alone.

## D.

Lastly, plaintiff argues the court erred by considering the affidavit of W.E. Seabrook and its attachments submitted in Seabrook's reply brief regarding the 2012 OSHA violation related to LOTO violations raised by plaintiff. Alternatively, plaintiff contends that, even if such evidence was properly considered, the court erred in considering and relying on "the conclusory and self-serving" portions of the Seabrook affidavit to deny plaintiff the inference that defendant had not abated the 2012 LOTO violation. Plaintiff argues the Seabrook affidavit was inadmissible pursuant to Rules 4:10-1, 4:17-7, and 4:18-1 and that defendant should not be permitted to expand its argument in a reply brief.

The affidavit primarily consisted of statements concerning defendant's 2012 OSHA citations for its failure to have written LOTO procedures in place for the ammonia room, and it included the averment of W.E. Seabrook that defendant had "abated all of the issues identified by OSHA in a timely manner." The documents annexed to the affidavit included a cover letter from OSHA acknowledging that defendant had communicated its intention to abate the violation and notices regarding five of the OSHA regulations defendant was cited for violating in 2012.

The court noted plaintiff did not request this information in discovery. Moreover, W.E. Seabrook was apparently not questioned at his deposition about these documents. It appears plaintiff obtained the OSHA documents from a public database and referenced them in his opposition to defendant's motion for summary judgment.[14] He did not serve any supplemental discovery requests to further explore the contents of the documents or Seabrook's response to the violations. The OSHA reports regarding the LOTO items were referenced by plaintiff's expert. As Seabrook notes, however, plaintiff's expert did not allege Seabrook failed to abate the 2012 LOTO items, but merely opined that Seabrook failed to follow industry standards for LOTO procedures.

The court admitted the Seabrook affidavit, noting plaintiff "opened the door" because Seabrook's affidavit was responsive to plaintiff's argument in opposition to summary judgment that the record supported the inference

---

[14] Although plaintiff claims the documents were generally required to be produced in response to Form C Interrogatory fourteen, which requires defendant to produce all relevant documentary evidence, Seabrook apparently objected to the question and there is no indication plaintiff ever moved to challenge the objection. Moreover, there is no indication plaintiff propounded discovery requests regarding OSHA violations that would have included the LOTO items related to the ammonia room. As the court determined, the 2012 OSHA inspection was not related to the production lines where plaintiff was injured.

defendant may have deceived OSHA regarding its abatement of the 2012 violations. Seabrook's affidavit reply, in turn, included the OSHA records that responded to the allegations and the purported "factual misstatements, inferences, and faulty conclusions" asserted by plaintiff.

A trial court's evidentiary ruling is reviewed "under the abuse of discretion standard because, from its genesis, the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion." State v. Prall, 231 N.J. 567, 580 (2018) (quoting Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010)). We defer to "[a] trial court's evidentiary rulings" unless "there has been a clear error of judgment." Grewal v. Greda, 463 N.J. Super. 489, 503 (App. Div. 2020) (quoting Belmont Condo. Ass'n v. Geibel, 432 N.J. Super. 52, 95 (App. Div. 2013)).

The court here essentially relied on the "opening the door" doctrine in considering Seabrook's affidavit and related documents. Since application of the opening the door doctrine is primarily suited for evidence that is otherwise inadmissible, plaintiff's contentions the court misapplied the doctrine are unavailing. The opening the door doctrine "authorizes admitting evidence which otherwise would have been irrelevant or inadmissible in order to respond to (1) admissible evidence that generates an issue, or (2) inadmissible evidence

admitted by the court over objection." State v. James, 144 N.J. 538, 554 (1996) (emphasis omitted).

In allowing the affidavit, which included W.E. Seabrook's statement that defendant had "abated all of the issues identified by OSHA in a timely manner," the court determined the information was relevant to the issues before it. Moreover, the court determined it was proper to consider the evidence, since it refuted plaintiff's implication that defendant did not abate the LOTO violations. We discern no error and conclude the court did not misapply its broad discretion in considering the evidence which was produced in direct response to the documents and arguments submitted by plaintiff in opposition to the summary judgment motion. In any event, based on our analysis above on independent grounds, the presence or absence of the Seabrook affidavit was not dispositive.

Plaintiff contends even if the Seabrook affidavit was properly admitted, the court erred in considering and relying on its "conclusory, self-serving assertions," such as "Seabrook abated all of the issues identified by OSHA in a timely manner," to infer that defendant abated the 2012 LOTO violation. Seabrook was entitled to address the allegations in plaintiff's opposition regarding the OSHA violations which were not addressed at the depositions of Seabrook's witnesses, and the court properly relied on the affidavit in response

to plaintiff's allegations that Seabrook possibly failed to abate certain violations to support its conclusions. We conclude the court did not err in its conclusions.

To the extent we have not specifically addressed any of plaintiff's remaining arguments, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1925-21